# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| TAYLOR FRESH FOODS, INC., a Delaware corporation, | ) ) ) | |
| Plaintiff, | ) ) | Case No. |
| v. | ) ) | |
| BRIAN THURE, an individual; | ) | |
| JULIE THURE, an individual; | ) | JURY DEMAND |
| MTS BUILDING AND ELECTRICAL; | ) | |
| and JAMES MCPHERSON, an individual, | ) | |
| Defendants. | | |

## COMPLAINT

Plaintiff Taylor Fresh Foods, Inc., ("TFF") by and through undersigned counsel, brings this Civil Complaint against Defendants Brian Thure ("Mr. Thure"), Julie Thure ("Mrs. Thure"), MTS Building and Electrical ("MTS"), and James McPherson ("Mr. McPherson") (collectively, "Defendants") and alleges as follows:

### I.     STATEMENT OF THE CASE

1.      This is an action for multiple claims under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, and Tennessee state and common law.

2.      The state and common law claims include fraudulent misrepresentation, fraudulent concealment, breach of fiduciary duty and duty of loyalty, unjust enrichment, conversion, civil conspiracy, and violations of Tenn. Code Ann. § 39-14-604, the Tennessee Personal and Commercial Computer Act ("TPCCA").

3.      This Complaint seeks redress for the prolonged abuse of corporate authority by Defendant Brian Thure, the former President of Taylor Farms Tennessee, Inc. ("TFTN"), a wholly

owned subsidiary of TFF, and the participation of his co-Defendant, Julie Thure, in a fraudulent scheme that spanned several years. Co-Defendants MTS and Mr. McPherson joined Mr. and Mrs. Thure's fraudulent scheme roughly four years ago. Mr. Thure, entrusted with the oversight of TFTN's operations, personnel, accounting, vendors, and overall company controls, exploited his position of trust and responsibility to divert corporate resources for personal gain in numerous ways. Defendants' actions included falsifying vendor charges, unauthorized payroll, personal-service arrangements paid for by TFF, improper reimbursements, personal construction work paid for by TFF, personal credit card charges paid for by TFF, unauthorized vehicle purchases, the routing of funds through sham entities and personal bank accounts, and other transactions that benefited Mr. Thure, his family, and his co-conspirators.

4. Mr. Thure concealed his schemes by manipulating his control over subordinate employees, internal reporting channels, accounting processes, and computer infrastructure, including manipulating TFF and TFTN's IT systems and circumventing their IT safeguards. Mrs. Thure actively participated in and aided in the concealment of fraud. Mr. McPherson facilitated the fraud by offering his personal bank account at Wilson Bank and Trust and Pinnacle Financial Partners to receive and disburse funds stolen from TFTN through the sham entity MTS Building and Electrical. These actions give rise to claims for fraud, fraudulent concealment, breach of fiduciary duty and duty of loyalty, conversion, unjust enrichment, civil conspiracy, tortious interference, and violation of the Computer Fraud and Abuse Act. Plaintiff brings this action to recover the losses caused by Defendants' misconduct, to obtain restitution and disgorgement of benefits wrongfully obtained, and to secure all other legal and equitable relief available.

## II.   JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action asserts claims arising under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, including claims for civil relief under 18 U.S.C. § 1030(g).

6.      This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because there is complete diversity of citizenship between the parties. TFF is incorporated in Delaware and maintains its principal place of business in California, making it a citizen of Delaware and California. Defendants Brian Thure, Julie Thure, MTS Building and Electrical, and James McPherson are all citizens of Tennessee. The amount in controversy exceeds $75,000, exclusive of interest and costs.

7.      This Court has supplemental jurisdiction over Plaintiff's related state and common law claims pursuant to 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy as Plaintiff's federal claim under the Computer Fraud and Abuse Act.

8.      This Court has personal jurisdiction over Defendants because all Defendants resided, operated, or transacted business in Tennessee; Mr. Thure resided and served as President of TFTN in Tennessee and directed the misconduct alleged herein from Tennessee; Mrs. Thure resided and participated in the fraudulent schemes in Tennessee; Mr. McPherson resided in Tennessee and maintained the bank account through which stolen funds were routed in Tennessee; and MTS purported to operate from Rockvale, Tennessee. All Defendants caused injury to Plaintiff TFF as well as TFTN in Tennessee.

9.      Venue is proper in the United States District Court for the Middle District of Tennessee pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) because Mr. Thure resides in this District

3

and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District, including at TFTN's Smyrna, Tennessee facility.

10. The acts, omissions, injuries, and losses described in this Complaint occurred in substantial part in Tennessee and arose from Mr. Thure's misuse of his authority over TFTN's Tennessee operations, employees, vendors, accounting processes, and computer systems.

## III. FACTUAL ALLEGATIONS

### A. The Parties

11. Plaintiff TFF is a Delaware corporation with its principal place of business in Salinas, California. TFF is a national leader in fresh food production and is the parent company of TFTN.

12. Defendant Brian Thure is an individual who, upon information and belief, is a citizen and resident of Tennessee.

13. At all times relevant to this Complaint, Mr. Thure served as the President of TFTN, a position he held from approximately 2012 through March 2026.

14. As President, Mr. Thure exercised broad authority over TFTN's day-to-day operations, including oversight of finance, human resources, vendor management, accounting, and all operational functions at TFTN's facilities.

15. Prior to joining TFTN, Mr. Thure served as Vice President of Processing and Distribution Operations at River Ranch Fresh Foods, LLC, a produce company based in Salinas, California.

16. Defendant Julie Thure is an individual who, upon information and belief, is a citizen and resident of Tennessee and the spouse of Brian Thure.

4

17. Between June 2013 and her removal from payroll on or about March 18, 2026, Defendant Brian Thure fraudulently placed Mrs. Thure on the payroll for TFTN without authority from TFF. Defendant Brian Thure continuously hid co-Defendant Julie Thure's presence on the TFTN payroll for years by removing her name from documents that would be reviewed by TFF and paying Mrs. Thure off-cycle bonuses designed to avoid detection from TFF.

18. Mrs. Thure actively participated in the fraudulent schemes described herein, including by submitting approximately $2,444,560 in fraudulent expense reimbursements, directing unauthorized charitable donations of TFTN funds, conspiring to place her family members and personal employees on TFTN's payroll, receiving unauthorized salaries and bonuses from TFTN and operating two personal businesses, Bear Clover Consulting and Bear Clover Bakery, that were subsidized by TFTN resources.

19. Defendant MTS is an unregistered entity that purported to operate as a building and electrical services vendor in Tennessee.

20. MTS was not registered with the State of Tennessee as a business entity, nor was it a registered contractor.

21. Upon information and belief, MTS was a sham entity used by Mr. Thure and Mr. McPherson to funnel stolen funds from TFTN.

22. Mr. McPherson is an individual who, upon information and belief, is a citizen and resident of Tennessee. Mr. McPherson is the principal of MTS Building and Electrical.

23. The W-9 submitted by MTS to TFTN listed Mr. McPherson's Social Security number, and the bank account connected to MTS was Mr. McPherson's personal account at Pinnacle Financial Partners.

5

### B. Mr. Thure's Position of Trust and Authority

24. TFTN is an operating company organized under the laws of the State of Tennessee, with its principal place of business at 199 Sam Ridley Parkway East, Smyrna, Tennessee 37167.

25. TFTN is a wholly owned subsidiary of TFF. TFTN operates two primary production facilities located in Smyrna, Tennessee and Covington, Kentucky, and manufactures products across all three of TFF's business segments: retail, deli, and foodservice.

26. As President of TFTN, Mr. Thure occupied a position of extraordinary trust and confidence within the company. He was the senior-most officer responsible for the stewardship of TFTN's assets and resources, and he owed duties of loyalty, care, and good faith to both TFTN and its parent company, TFF.

27. While Mr. Thure had authority to approve invoices, direct expenditures, authorize hires, approve expense reimbursements, and manage vendor relationships on behalf of TFTN by virtue of his role as President, Mr. Thure was expected to uphold his fiduciary duties towards TFF and TFTN and to not engage in self-dealing. TFF and TFTN reposed trust and confidence in Mr. Thure to exercise this authority solely for the benefit of TFF and TFTN and in furtherance of their legitimate business interests.

28. All employees at TFTN's facilities reported directly or indirectly to Mr. Thure. This included the Controller, the Director of Human Resources, the VP of Operations, VP of Sales and accounting staff, and all other management personnel. Mr. Thure used his position of dominance and authority to bribe subordinates to remain silent about irregularities for his personal benefit.

### C. Discovery of the Fraud

29. In or about early 2025, TFF underwent an IRS audit for the fiscal year ending June 2023. As part of that audit, the IRS agent requested 1099 forms from all TFF operating companies.

6

30. During the course of this review at TFTN, TFF was made aware of concerns regarding MTS and other questionable reimbursement practices occurring at TFTN. A subsequent investigation by TFF uncovered an extensive, multi-year fraudulent scheme.

31. The investigation revealed that Mr. Thure, together with Mrs. Thure, MTS, Mr. McPherson and others, coordinated, conspired, and stole more than $32 million from TFTN over several years.

**D.      Mr. Thure's and Mr. McPherson's Admissions**

32. Proof of Mr. Thure's misconduct includes, without limitation, the following:

a. On or about March 16, 2026, Mr. Thure admitted during a recorded telephone conversation with TFF corporate representatives that he stole funds from TFTN. During this call, Mr. Thure also spoke to his propensity to engage in extravagant personal spending on activities such as gambling and women, none of which were related to any legitimate business purpose. Upon information and belief, Mr. Thure continues to expend stolen funds, demonstrating the reckless and irresponsible dissipation of TFF's assets.

b. On or about March 17, 2026, Mr. Thure voluntarily transmitted a personal balance sheet for himself and Mrs. Thure, along with a personal account statement, to TFF representatives, representing personal assets they acquired with funds stolen from TFTN.

c. On or about March 26, 2026, Mr. Thure's co-conspirator, Mr. McPherson, contacted a TFF representative and confirmed the fraudulent activity directed by Mr. Thure through the entity known as MTS Building and Electrical.

d. Mr. McPherson subsequently confirmed that the bank account connected to MTS at Pinnacle Financial Partners was his personal account and that Mr. Thure used this account to pay for his personal projects, tuition for Mr. McPherson's child, among other things.

e. Upon information and belief, Mr. McPherson knew or should have known that the funds flowing through his account were not legitimate compensation for products and/or services, and were, in fact, fraudulently converted funds of TFTN.

f. On or about April 8, 2026, Mr. Thure left a voicemail for Bruce Taylor, CEO of TFF, in which he confessed to and apologized for his fraudulent misconduct. Subsequently, Mr. Thure further admitted his guilt in several text messages to TFF representatives.

33. The investigation also uncovered dozens of fraudulent invoices, falsified expense reports, and other documentary evidence corroborating the fraudulent scheme.

E. **Fraudulent Schemes Involving Defendants**

**Mr. Thure Fabricated Invoices Through the Sham MTS Entity**

34. From approximately April 2021 through March 2026, Mr. Thure orchestrated a scheme involving a purported vendor entity called "MTS Building and Electrical."

35. MTS and Mr. McPherson performed a kitchen remodel and certain other construction work for TFTN in 2022 that is believed to have been legitimate and totaled roughly $400,000.

36. After the completion of that legitimate work, and over the course of several years, Mr. Thure submitted invoices on behalf of MTS to TFTN for work that was either never performed or was never performed by MTS.

37. Mr. Thure personally approved all MTS invoices and ran them outside of TFTN's normal purchase order system for tracking maintenance and capital expenditures.

38. For projects over $3,000, the normal process for creating and tracking maintenance department expenditures included the creation of a purchase order by maintenance department

8

personnel, a two-signature approval process by maintenance department personnel, and submission to the accounts payable department. Mr. Thure was well aware of this process.

39. TFTN's Accounts Payable Department would then match invoices with their respective purchase orders, verify that items and price match, confirm with the maintenance department that the work was completed, and submit for final approval to Mr. Thure.

40. Instead of following the normal submission process, Mr. Thure personally handed MTS invoices to accounts payable personnel, orally instructed accounts payable personnel on how to code them, directed accounting personnel to process payment without the ordinary purchase-order controls, and remained the only representative of TFTN authorized to approve MTS invoices.

41. Upon information and belief, when accounting personnel sought clarification or documentary support for suspicious invoices, Mr. Thure demanded immediate payment and used his position of authority to override the normal process for vendor invoice coding and payment.

42. The MTS invoices bore sequential invoice numbers and contained multiple instances of identical or similar amounts owed.

43. Most invoices were deliberately structured between $35,000 and $45,000 to avoid the heightened scrutiny and additional TFF oversight that accompanied transactions exceeding $50,000.

44. When employees raised questions about invoices that appeared inconsistent with plant operations or were difficult to code or justify because Mr. Thure did not provide an adequate description of the service or project performed in the ordinary course of business, Mr. Thure demanded that employees pay the invoices without clarification.

45. TFTN accounting personnel confirmed that they processed questionable invoices because they believed Mr. Thure would fire them if they refused.

46. Upon information and belief, Mr. Thure used his authority to bypass normal segregation of duties by directing that invoices be submitted and processed outside established review channels, including by hand-delivering invoices directly to accounting for payment.

47. In total, Mr. Thure caused TFTN to pay over $12 million to MTS, and Mr. Thure admitted his involvement in the scheme in a recorded call with TFF representatives.

**The Bank Account for the Sham Entity MTS was Held in a Bank Account Under Mr. McPherson's Name**

48. MTS was not a registered entity with the State of Tennessee, nor was it a registered contractor.

49. The W-9 submitted by MTS listed the Social Security number of Mr. McPherson.

50. The bank account receiving TFTN's ACH payments to MTS was maintained under Mr. McPherson's name, initially at Wilson Bank and Trust and, starting in or around June 2024, at Pinnacle Financial Partners.

51. On or about March 26, 2026, Mr. McPherson contacted TFF representatives and confirmed the fraudulent activity directed by Mr. Thure through MTS.

52. Mr. McPherson subsequently confirmed that the bank account connected to MTS at Pinnacle Financial Partners was his personal account and that both Mr. Thure and Mr. McPherson used this account to pay for Thure's personal family projects.

53. Upon information and belief, Mr. McPherson knew or should have known that the funds flowing through his personal bank account were not legitimate compensation and were, in fact, proceeds of fraud against TFTN. However, Mr. McPherson was receiving benefit from the funds flowing through his account by taking a regular stipend totaling hundreds of thousands of dollars over the years, including paying for his child's tuition out of the account proceeds among other things.

10

## Mr. Thure Adds Family Members to the TFTN Payroll

54. From approximately March 2013 through March 2026, Mr. Thure added Mrs. Thure, her mother Earlene Lewis, and her sister Lisa Robyn to the TFTN payroll. None of these individuals were authorized by TFF to be hired, and the hiring of family members for illegitimate purposes was outside the scope of Mr. Thure's authority as President of TFTN.

55. Mr. Thure knew that these individuals were not authorized to be employed by TFTN because he deliberately excluded them from the standard salaried employee list sent annually to TFF for compensation and bonus review. He further approved off-cycle bonuses for these individuals to avoid detection.

56. The total cost to TFTN for these unauthorized family members, including wages, benefits, 401(k) matches, insurance, phone allowances, car allowances, and employer-paid taxes, was approximately $3 million. Specifically:

a. Mrs. Thure was on TFTN's payroll from approximately March 2013 through March 2026, at a total cost of approximately $774,900. She was allegedly employed as an events coordinator, and Mr. Thure excluded her from the standard compensation and bonus list sent annually to TFF for review by Bruce Taylor.

b. Earlene Lewis, Mrs. Thure's mother, was on TFTN's payroll from approximately October 2015 through March 2026, at a total cost of approximately $1,095,098.76. Although she performed some accounting functions for TFTN until approximately 2020, she retired in or around 2020 but continued to receive paychecks and benefits pursuant to Mr. Thure's direction.

c.      Lisa Robyn, Mrs. Thure's sister, was on TFTN's payroll from approximately September 2017 through March 2026, at a total cost of approximately $1,056,175.97. Robyn never performed any legitimate services for TFTN.

**Defendant Brian Thure Adds Personal Service Staff to TFTN Payroll**

57.     From approximately October 2015 through March 2026, Mr. Thure fraudulently employed various individuals through TFTN who exclusively performed personal services for the Thure family while performing no legitimate work for TFTN. These individuals included Mr. Thure's and Mrs. Thure's personal chef, personal driver, handyman, personal trainer, aquarium maintenance attendant, and an employee of Mrs. Thure's company, Bear Clover Consulting.

58.     TFF's investigation confirmed that the individuals hired to perform services exclusively for Mr. Thure and Mrs. Thure never performed legitimate work for TFTN.

59.     Mr. Thure intentionally excluded these individuals from the standard compensation and bonus list sent annually to TFF for review by CEO Bruce Taylor by manually removing or directing the removal of these individuals from the list of employees sent to Mr. Thure by the payroll department before the list was submitted to TFF for review.

60.     Mr. Thure then approved off-cycle bonuses for these individuals that were not authorized by TFF.

61.     Most of these individuals also received improper benefits by virtue of their purported employment, including 401(k) matching contributions, health insurance benefits, company phones, and vehicles.

62.     The total cost to TFF and TFTN for employing these fraudulent personal employees of Mr. Thure and Mrs. Thure exceeded $3 million. The individuals involved and the costs to TFTN included:

12

a. A friend of Mrs. Thure who worked for Bear Clover Consulting, Mrs. Thure's personal business, received approximately $996,070 from TFTN. Mrs. Thure's friend admitted that she worked for Mrs. Thure and Bear Clover Consulting and not for TFTN.

b. Upon information and belief, Mrs. Thure advocated that her friend, who worked for Bear Clover Consulting, be placed on the TFTN payroll in order to convert proceeds of TFTN for work performed by her for Mrs. Thure's personal business.

c. Mr. Thure's and Mrs. Thure's personal chef was on TFTN's payroll from May 2022 through March 2026, at a total cost of approximately $493,484.

d. Mr. Thure's and Mrs. Thure's personal chauffeur was on TFTN's payroll from December 2021 through March 2026, at a total cost of approximately $563,341.

e. Mr. Thure's and Mrs. Thure's personal trainer and pool maintenance person was on TFTN's payroll from July 2022 through March 2026, at a total cost of approximately $381,331.

f. Mr. Thure's and Mrs. Thure's personal aquarium maintenance attendant, was on TFTN's payroll from February 2021 through March 2026, at a total cost of approximately $452,273.

g. The son of the former Controller of TFTN was on TFTN's payroll from February 2021 through April 2023, at a total cost of approximately $413,082. Mr. Thure and Mrs. Thure insisted that the son be placed on TFTN payroll so that his medical bills would be covered through TFF's healthcare plan. Because TFF is self-insured, the son's medical claims were a direct cost to TFF.

## Defendants Brian Thure and Julie Thure
## Fabricate Expense Reports for Personal Reimbursement

63. For several years, Mr. Thure and Mrs. Thure routinely submitted fraudulent and falsified expense reports to TFTN, claiming reimbursement for purportedly work-related expenses that were either entirely fabricated or purely personal in nature.

64. Mrs. Thure, who was not an authorized employee of TFTN, had her fraudulent expense reports approved by Mr. Thure himself.

65. Mr. Thure submitted his own expense reimbursement requests to TFTN's accounting department after approving them himself, thereby circumventing any meaningful oversight.

66. In total, Mr. Thure submitted over $4 million in fraudulent expense reimbursements, and Mrs. Thure submitted approximately $2.5 million in fraudulent expense reimbursements, for a combined total exceeding $6.5 million.

67. Notably, nearly $2 million of these fraudulent reimbursements were submitted in the last two years of the scheme. Upon information and belief, this dramatic escalation coincided with the Thures' increased financial obligations relating to their purchase of a $5.5 million home in Hawaii as well as a 400-acre ranch in Humboldt County, California. Mr. Thure and Mrs. Thure's big ticket purchases also demonstrate the established and ongoing waste of TFF's assets that will continue to occur as long as Mr. Thure and Mrs. Thure maintain control of TFF's stolen property.

**Defendants Brian Thure and Julie Thure**
**Divert TFTN Vendors for Personal Construction Projects**

68. From approximately March 2013 through March 2026, Mr. Thure and Mrs. Thure directed TFTN vendors to perform personal construction and remodeling work at the Thures' various personal properties, paid by TFTN.

69. The personal work performed at TFTN's expense included, among other things: remodel work at two lake houses owned by the Thures; remodel work at the Thures' personal residence; installation of a commercial kitchen and bakery area in the basement of the Thures' personal residence for Mrs. Thure's Bear Clover Bakery business; and ordering and shipping of supplies and equipment, including construction motor vehicles, to develop the Thures' 400-acre ranch in Humboldt County, California.

70. Mr. Thure directed vendors to submit fraudulent invoices that concealed the actual nature of the work performed to make it appear as though the work was for legitimate TFTN business purposes. Work at the Thure residence and lake house was intentionally and falsely coded as work for the TN and KY facilities.

71. Employees and members of management at TFTN were told by Mr. Thure that the personal work was permissible because Mr. Thure supposedly owned part of TFTN.

72. Contractors that performed personal construction and remodeling work at the Thures' various properties were told by Mr. Thure that refusal to perform work at the homes of Mr. Thure and other senior members of management would jeopardize their ability to continue working as a vendor with TFTN.

73. The vendors exploited by Mr. Thure in this scheme performed personal construction and remodeling work for Mr. Thure, Mrs. Thure and other senior members of TFTN management in exchange for amounts paid by TFTN.

15

74. Upon information and belief, nearly $3 million was stolen by Mr. Thure via vendors conducting work on his personal properties.

75. Upon information and belief, Mr. Thure routinely initiated vendor work and incurred charges before any legitimate purchase order request, quote review, or scope validation occurred.

76. Mr. Thure also directed or required maintenance personnel to generate after-the-fact purchase orders to create the appearance of regularity (unlike MTS Building invoices where no purchase orders were generated).

77. Upon information and belief, Mr. Thure frequently provided invoices rather than quotes for approval and required personnel to process the invoices as "emergency" or otherwise time-sensitive, even where no legitimate emergency existed.

78. When maintenance staff questioned whether work had been performed or whether materials had been delivered for purported facility projects, they were instructed to process the paperwork anyway and not to ask questions.

79. To avoid scrutiny from TFF and conceal the personal nature of the work, Mr. Thure caused payments and charges to be split into multiple smaller amounts, including by spreading a single project across multiple invoices and purchase orders.

80. TFTN personnel attempted to preserve internal records reflecting that certain invoices and purchase orders were tied to Mr. Thure's personal properties and projects or the properties of other members of senior management at TFTN, including by using internal codes or initials in supporting paperwork that did not appear on the face of the invoices.

81. Maintenance personnel and some vendors, for example, used the letter "W" to identify the Thures' Winchester lake house, and similar codes were used as "breadcrumbs" so

employees could later identify personal projects that had been intentionally disguised as TFTN work.

**Defendant Brian Thure Bribes Others to Buy Silence and Conceal His Fraud**

82. From approximately January 2025 through March 2026, Mr. Thure knowingly and intentionally caused TFTN to pay for personal construction work performed at the homes of certain members of TFTN's management team. Upon information and belief, these expenditures constituted bribes intended to ensure the silence of employees who might otherwise have reported Mr. Thure's fraudulent activity to TFF.

83. The employees who received these benefits were among the individuals who approved credit card statements, expense reports, and the transfer of TFTN property, including tickets owned by TFTN, thereby providing crucial cover for Thure's financial misconduct.

**Defendant Brian Thure Misappropriates Corporate Funds
Through Ticket Purchases and Resales**

84. From approximately June 2022 through March 2026, Mr. Thure and the former IT Manager at TFTN, fraudulently sold the TFTN suite at Nissan Stadium in Nashville, Tennessee to a third-party broker and misappropriated the proceeds thereby depriving TFTN from using the suite for its intended business development purposes.

85. Mr. Thure directed the former IT Manager to sell tickets to a suite previously purchased by TFTN to a third-party ticket broker.

86. Mr. Thure would receive payment for the cost of the suite plus a commission. Mr. Thure misappropriated the proceeds from these ticket sales and sent the former IT Manager a portion of the proceeds from Mr. Thure's personal account in exchange for facilitating the ticket purchases.

17

87. These ticket sales included, but were not limited to, the use and purchase of TFTN's Nissan Stadium Suite for various concerts such as CMA Fest.

88. TFTN has identified a check from Mr. Thure to TFTN's former IT Manager in the amount of $8,000 connected to this scheme.

89. The former IT Manager also surrendered a check for approximately $37,838 which he confirmed represented the amount he was paid by Mr. Thure for participating in the ticket purchase/resell scheme.

90. The amount of TFTN funds stolen through this scheme is estimated to exceed $100,000.

91. Upon information and belief, TFTN's former IT Manager set up a second internet connection in Mr. Thure's office presumably to allow Mr. Thure to conduct internet searches and schemes outside of the TFF and TFTN's computer systems.

**Defendants Brian Thure and Julie Thure Make Unauthorized Charitable Donations Without Approval from TFF**

92. From approximately March 2013 through March 2026, Mr. Thure and Mrs. Thure knowingly and fraudulently caused TFTN to make donations to various charities and organizations without the authorization of TFF, as was required by TFF policy.

93. The recipients of these unauthorized donations included the Boys and Girls Club and Middle Tennessee Christian School, a private school where Mr. Thure's and Mrs. Thure's son was enrolled.

94. Mr. Thure and Mrs. Thure directed over $800,000 in TFTN funds to Middle Tennessee Christian School alone.

95. Mr. Thure admitted on a recorded call with TFF representatives that Mrs. Thure was involved in directing the donations.

18

**Defendants Brian Thure and Julie Thure Open and Use
Corporate Credit Cards for Personal Expenses**

96. From approximately May 2016 through March 2026, two credit cards were openly used by Mr. Thure, Mrs. Thure, and other members of the TFTN management team for personal expenses, with TFTN funds used to pay the balances.

97. One such credit card was in the name of TFTN's former Controller.

98. The second credit card was in the name of TFTN's former IT Manager.

99. TFTN's former IT Manager admitted that the credit card under his name was used extensively, as directed by Mr. Thure, for personal expenses of TFTN employees.

100. Transaction records indicate that both cards were used extensively for personal, non-business purposes. The expenses were approved by two members of TFTN management who themselves received personal benefits from Mr. Thure, including construction work at their homes and personal expenses paid by TFTN.

101. Mrs. Thure was in possession of TFTN's former IT Manager's credit card number and routinely used it to make personal purchases, including for her bakery business.

102. Upon information and belief, Mrs. Thure's personal expenses regularly appeared on TFTN's former IT Manager's credit card statement.

103. Mr. Thure used TFTN's former IT Manager's credit card to make purchases for his personal properties, including a $15,000 purchase for a golf cart for Mr. Thure's home in Hawaii.

104. Mr. Thure directed TFTN's former IT Manager not to keep receipts in an effort to conceal his intentional conversion of TFTN proceeds.

105. Mr. Thure directed others to approve TFTN's former IT Manager's expense reports in an effort to conceal his intentional conversion of TFTN proceeds.

106. The total amount stolen through this credit card scheme exceeds $3 million.

**Defendants Brian Thure and Julie Thure**
**Purchase Personal Vehicles Using Plaintiff's Funds**

107. From approximately March 2013 through March 2026, Mr. Thure and Mrs. Thure caused TFTN to purchase numerous vehicles for their personal use.

108. These purchases included at least one vehicle valued at approximately $160,000, plus various other vehicles.

109. The total amount stolen through personal vehicle purchases exceeds $250,000.

**F.      Defendants' Use of Stolen TFF Funds**

110. Mr. Thure and Mrs. Thure spent the proceeds of their fraud on high-value real estate, investments, and vanity projects, including, without limitation:

a.      Approximately $1 million to fund the "Brian and Julie Thure Right Tackle Endowment" at UC Berkeley, where Mr. Thure played football prior to joining the then-named Washington Redskins NFL team (now named Washington Commanders). Although the press release around the endowment was subsequently taken down by the university, the Thures still reflect approximately $400,000 in remaining liability on their personal balance sheet relating to this gift.

b.      Approximately $5.5 million to purchase a luxury home in Hawaii in October 2024, located at 3770 Alaoli Way, Lihue, Hawaii. Upon information and belief, approximately $1.4 million in debt remains on this property. Mrs. Thure donated the use of this property to Middle Tennessee Christian School for fundraising purposes and publicly posted about the property on social media.

c.      Approximately $1.5 million to purchase and develop a 400-acre ranch in Humboldt County, California. Millions of additional dollars were stolen by the Thures to purchase

equipment, supplies, and construction vehicles that were shipped to California for use on these parcels.

d.      Approximately $300,000 to purchase a home in Covington, Kentucky.

e.      Upon information and belief, Mr. Thure also transferred and continues to transfer stolen funds through cryptocurrency exchanges in an effort to further conceal and dissipate the proceeds of Defendants' fraud.

f.      On or about April 16, 2026, Mr. Thure also transferred approximately $600,000 for purposes presumed to further conceal and or dispose of the proceeds of Defendants' fraud, and consequently frustrate TFF's ability to trace and recover misappropriated assets.

**G.      <u>Defendants Intent to Defraud TFF and TFTN</u>**

111.    Mr. Thure's conduct was knowing, intentional, and willful. Mr. Thure's intentional misconduct in defrauding TFTN includes the following:

a.      Mr. Thure occupied the most senior position of trust within TFTN and deliberately exploited that trust to perpetrate his schemes over several years.

b.      Mr. Thure used his position of authority to bribe subordinate employees to approve invoices and expense reports, or to remain silent about irregularities they observed.

c.      Mr. Thure deliberately excluded Mrs. Thure, her family members, and personal employees from the regular bonus review process for employees submitted annually to TFF, and instead paid off-cycle bonuses and salary increases that he knew were unauthorized, specifically to conceal their presence on the payroll from TFF oversight.

d.      Mr. Thure approved MTS invoices outside of TFTN's conventional accounting system used to track repair, maintenance, and capital expenditures, which was an intentional and deliberate act to circumvent TFTN's internal controls.

21

e.	While Mr. Thure was in rehabilitation for a DUI conviction in 2024, he continued to approve fraudulent invoices despite having limited ability to communicate with the outside world, demonstrating the critical and ongoing nature of his personal involvement in the fraud.

f.	Mr. Thure had a separate, private internet connection installed in his office at TFTN, which, upon information and belief, was done to hide his fraudulent activity from the TFF and TFTN's IT systems.

g.	After TFTN's discovery of the fraud, Mr. Thure attempted to change his passwords on at least one bank account in an attempt to conceal evidence of his financial wrongdoing.

h.	Several of the fraudulent employees hired by Mr. Thure and Mrs. Thure attempted to withdraw their 401(k) balances shortly after their respective removals from TFTN's payroll, suggesting coordinated efforts to abscond with the stolen wages.

i.	Mr. Thure deliberately structured the MTS invoices at amounts routinely less than $50,000 because he knew that invoices in excess of that threshold were likely to draw scrutiny from accounting staff.

j.	Upon information and belief, when TFTN purchased a new plant in Kentucky in 2019, Mr. Thure directed several fraudulent transactions to the new plant to take advantage of reduced oversight during the startup period.

## H.	Concealment of the Fraud and Damages

112.	Throughout the extensive duration of the fraud, Mr. Thure actively took steps to conceal his misconduct from TFF and from TFTN's own employees and internal controls.

113. Mr. Thure's concealment efforts included, without limitation: addressing the MTS invoicing outside of TFTN's standard accounting systems; structuring individual transactions below detection thresholds; excluding unauthorized employees from compensation reviews sent to TFF; approving his own and his wife's expense reports; directing vendors to submit false invoices disguising the nature of the personal work performed; using his power and authority to prevent employees from refusing his directives; and bribing subordinate managers with personal benefits to ensure their silence and complicity.

114. Mr. Thure also attempted to conceal his fraud by installing and using a separate, personal internet connection in his TFTN office.

115. Mr. Thure directed the former IT Manager to hire Comcast to install and operate an unauthorized internet connection in his office at TFTN, outside of TFF's managed IT environment, for the purpose of conducting and concealing fraudulent activity and misappropriating TFF and TFTN proceeds.

116. Mr. Thure used the separate internet connection to store, generate, and transmit fraudulent invoices, false supporting documentation, and other records connected to the schemes described above, while intentionally avoiding TFF's normal security controls, monitoring, and audit trails.

117. Mr. Thure used the separate internet connection to work around the TFF and TFTN's IT systems and/or information (including vendor, accounting, and payment information) in a manner that exceeded his authorized access and was not for any legitimate business purpose, and to further the intended fraud and obtain things of value, including the payment of fraudulent invoices and other disbursements.

118. Mr. Thure intentionally took steps to bypass or impair TFF's logging, monitoring, and internal controls by routing communications and files through a separate, personal internet connection in his office, thereby hindering TFF's ability to monitor, detect, and respond to the misconduct in real time.

119. Upon information and belief, Mr. Thure also utilized cryptocurrency exchanges to transfer funds derived from Defendants' fraudulent schemes, thereby further obscuring the flow of stolen proceeds and frustrating TFF's ability to trace and recover misappropriated assets.

120. As a result of Mr. Thure's misconduct involving unauthorized and/or improper access and use of computers and computer systems, TFF has incurred losses including forensic IT investigation costs, response and remediation costs, and other consequential costs exceeding $100,000.

121. TFF has been forced to incur substantial costs investigating Mr. Thure's fraud, including retaining outside counsel and forensic accountants, remediating the damage to its financial controls and accounting systems, and pursuing recovery of the stolen assets.

122. As a direct and proximate result of Mr. Thure's fraudulent schemes and active concealment, TFTN has suffered damages exceeding $32,000,000.

### V.      CLAIMS FOR RELIEF

### <u>COUNT I</u>
### Violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030
### (Against Defendant Brian Thure)

123. TFF incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

124. TFF's computers, servers, networks, accounting systems, vendor systems, payment systems, and related electronic records were "protected computers" within the meaning of the 18

U.S.C. § 1030(e)(2)(a) because they were used in and affected interstate commerce and communication.

125. Mr. Thure was authorized, as TFTN's President, to use TFF's computers and systems only for legitimate company business and within TFF's ordinary IT, accounting, security, monitoring, and audit controls. He was not authorized to create, cause to be created, or use a separate private internet connection or related networking equipment in his office to route activity outside TFF's managed IT environment.

126. Upon information and belief, by installing, operating, and using that separate internet connection, Mr. Thure intentionally accessed TFF's protected IT environment without authorization and/or exceeded authorized access, including by bypassing the channels through which TFF monitored, logged, secured, and audited access to its electronic systems and records.

127. Mr. Thure violated 18 U.S.C. § 1030(a)(2)(C) by intentionally accessing TFF's protected computers without authorization and/or in excess of authorization and thereby obtaining information from TFF's systems, including vendor, accounting, payment, invoice, reimbursement, and other business records that he used to further and conceal the fraudulent schemes alleged in this Complaint.

128. Mr. Thure violated 18 U.S.C. § 1030(a)(4) by knowingly and with intent to defraud accessing TFF's protected computers without authorization and/or in excess of authorization through the separate connection and unauthorized server; by means of that conduct, he furthered the intended fraud and obtained things of value, including the payment of fraudulent invoices, reimbursements, payroll payments, and other disbursements of TFF's funds.

129. Mr. Thure violated 18 U.S.C. § 1030(a)(5)(C) by intentionally accessing TFF's protected computers without authorization through the separate internet connection, server, and

related networking equipment and, as a result, causing damage and loss, including impairment of the integrity and availability of TFF's logs, audit trails, security controls, accounting controls, and related electronic information, and costs incurred to investigate, respond to, and remediate that impairment.

130. TFF's losses within the meaning of 18 U.S.C. § 1030(e)(11), including forensic IT investigation costs, response costs, remediation costs, and other costs incurred to assess and address Mr. Thure's unauthorized access and concealment, exceeded $5,000 during a one-year period in accordance with 18 U.S.C. § 1030(a)(4). TFF is therefore entitled to compensatory damages, injunctive relief, and other relief available under 18 U.S.C. § 1030(g).

131. As a direct and proximate result of Mr. Thure's aforementioned conduct in violation of the Computer Fraud and Abuse Act, Plaintiff and TFTN suffered losses during a one-year period exceeding $5,000, including forensic IT investigation costs, response costs, remediation costs, and other consequential losses, satisfying 18 U.S.C. § 1030(c)(4)(A)(i)(I) and giving rise to this independent action under 18 U.S.C. § 1030(g).

132. TFF has been damaged by the costs and fees incurred in investigating the unauthorized access and the costs and fees that TFF has and will incur in connection with this claim.

133. TFF is entitled to compensatory damages, restitution, injunctive relief, and all other relief available under 18 U.S.C. § 1030(g) and applicable law.

**COUNT II**
**Violation of Tennessee Personal and Commercial Computer Act,**
**Tenn. Code Ann. § 39-14-602**
**(Against Defendant Brian Thure)**

134. TFF incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

135. Section 604 of the Tennessee Personal and Commercial Computer Act ("TPCCA") provides a private right of action for violations of the TPCCA.

136. Mr. Thure knowingly accessed TFF and TFTN's computer network for the purpose of obtaining money, property, or services for himself by means of false or fraudulent pretenses.

137. Mr. Thure knowingly received, concealed, or used money, property, and services for himself by means of false or fraudulent pretenses.

138. As a direct and proximate result of Mr. Thure's aforementioned conduct, TFF has experienced damage to its goodwill and reputation and has been damaged by the costs and fees incurred investigating unauthorized access, including the costs and fees that TFF has and will incur in connection with this claim.

139. Section 604(a) of the TPCCA provides a private right of action for TFF to recover for the damage incurred from Mr. Thure's violative conduct, including lost profits and the costs of a civil action. Tenn. Code Ann. § 39-14-604(a).

## COUNT III
### Civil Conspiracy
### (Against All Defendants)

140. TFF incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

141. Mr. Thure acted in concert with Mrs. Thure, Mr. McPherson, and MTS, and others, to accomplish an unlawful purpose and to accomplish lawful purposes by unlawful means, including by causing the submission and payment of fraudulent invoices, routing stolen funds through the MTS bank account at Wilson Bank and Trust and Pinnacle Financial Partners, placing unauthorized individuals on TFTN payroll, diverting vendor work to personal properties, misusing company credit cards and tickets, and concealing the schemes from TFF and TFTN.

142. In furtherance of the conspiracy, Mr. Thure and his co-conspirators engaged in several overt acts in furtherance of the conspiracy including submitting and approving fraudulent invoices, routing payments through a sham company, MTS, directing personal work by company vendors, approving unauthorized payroll and reimbursements, misappropriating TFF and TFTN funds, and using intimidation and concealment to prevent discovery of the ongoing fraud.

143. Defendants attempted to accomplish this scheme by concerted action. This concerted action was done for an unlawful purpose while Mr. Thure owed fiduciary duties and a duty of loyalty to TFF and TFTN and by unlawful means – the conversion and misappropriation of funds and inventory.

144. Mr. Thure, Mrs. Thure, Mr. McPherson, and MTS acted maliciously, intentionally, fraudulently, and/or recklessly, and Plaintiff is entitled to punitive damages.

145. As a direct and proximate result of Defendants' conspiracy, TFF has suffered damages in an amount to be proven at trial, but in excess of $32,000,000, and Defendants should be required to disgorge all benefits obtained through their unlawful conduct.

## COUNT IV
**Fraudulent Misrepresentation (Intentional Misrepresentation)**
**(Against Defendants Brian Thure and Julie Thure)**

146. TFF incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

147. As alleged herein, Mr. Thure and Mrs. Thure were not authorized to use company credit cards for personal, non-company expenses, nor were they entitled to reimbursement of personal, non-company expenses.

28

148. On multiple and numerous occasions, as alleged herein, Mr. Thure and Mrs. Thure directed the submission and approval of expense reports seeking reimbursement for personal, non-company expenses.

149. On multiple and numerous occasions, as alleged herein, Mr. Thure and Mrs. Thure submitted falsified invoices for payment for personal, non-company expenses.

150. Mr. Thure intentionally and fraudulently misrepresented the nature and details of the expense reports, credit card payments, and invoices for which he sought reimbursement or payment.

151. Mr. Thure thus made materially false representations and omissions to TFF and TFTN.

152. Specifically, Mr. Thure approved and caused the payment of invoices, expense reports, payroll records, charitable donations, credit card charges, and vendor payments that he represented to be legitimate business expenses, when in truth they were personal expenses, fabricated charges, unauthorized payments, or payments for work that was not performed for TFTN.

153. Specifically, Mrs. Thure caused the payment of payroll records, charitable donations to her son's school, credit card charges, and vendor payments that Mr. Thure represented to be legitimate business expenses, when in truth they were personal expenses, fabricated charges, unauthorized payments, or payments for work that was not performed for TFTN.

154. Mr. Thure and Mrs. Thure knew that the foregoing representations were false, acted with reckless disregard for the truth, or made the representations without belief in their truth.

155. At the time of such misrepresentations to Plaintiff, Mr. Thure and Mrs. Thure knew such misrepresentations were false.

156. At the time of such misrepresentations, Mr. Thure and Mrs. Thure knew that if they represented their expenses truthfully or had disclosed the nature and true purpose of their expenditures, TFF and TFTN would not have reimbursed or directed payment.

157. Mr. Thure made the foregoing false representations with the intention of inducing TFF and TFTN to rely on them, and specifically with the intent of inducing TFF and TFTN, among other things, to conceal their falsity by bypassing normal controls, hand-delivering invoices to accounting, instructing employees how to code invoices, overriding employees who questioned his directives, and using false descriptions and internal codes to falsify expense reimbursements and disguise personal projects as TFTN work.

158. TFF, directly and through its wholly owned subsidiary TFTN, reasonably and justifiably relied on Mr. Thure's intentional and fraudulent misrepresentations and omissions because Mr. Thure was TFTN's President, occupied the senior-most position of trust at the company, and had authority over finance, vendor management, accounting, hiring, expense reimbursements, and operations.

159. Mr. Thure acted maliciously, intentionally, fraudulently, and/or recklessly, and TFF is entitled to punitive damages.

160. As a direct and proximate result of Mr. Thure's and Mrs. Thure's fraudulent concealment, TFF has suffered damages in an amount to be proven at trial, but in excess of $32,000,000, and Mr. Thure and Mrs. Thure should be required to disgorge all benefits obtained through their unlawful conduct.

## COUNT V
## Fraudulent Concealment
### (Against Defendant Brian Thure)

161. TFF incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

162. Mr. Thure owed TFF and TFTN fiduciary duties to disclose material facts concerning his use of TFF and TFTN funds, vendors, employees, computer systems, and accounting processes because he was President of TFTN, exercised control over those functions, and occupied a fiduciary position of trust.

163. Mr. Thure intentionally concealed material facts by hiding unauthorized people on TFTN's payroll from TFF compensation review, processing falsified invoices outside normal accounting channels, directing vendors to submit invoices with false descriptions, maintaining a separate internet connection and unauthorized server, and discouraging employees from reporting concerns through fear, threats, and intimidation.

164. Mr. Thure further intended that TFF remain unaware of the true facts so that the fraudulent payments and reimbursements would continue.

165. TFF reasonably relied on Mr. Thure's concealment because the concealed information was within Mr. Thure's control, employees were deterred from escalating concerns, and the records presented to accounting appeared to originate from authorized company channels.

166. Due to Mr. Thure's failure to disclose material information about the nature and extent of this use of the stolen funds, TFF and TFTN were unaware of the concealed facts and could not reasonably discover the full extent of Mr. Thure's misconduct while he controlled the relevant information and personnel.

167. As a direct and proximate result of Mr. Thure's fraudulent concealment, TFF and TFTN suffered injury because the concealment prevented timely detection of the fraud and allowed it to continue and expand for several years.

168. Mr. Thure acted maliciously, intentionally, fraudulently, and/or recklessly, and TFF is entitled to punitive damages.

169. As a direct and proximate result of Mr. Thure's fraudulent concealment, TFF has suffered damages in an amount to be proven at trial, but in excess of $32,000,000, and Mr. Thure should be required to disgorge all benefits obtained through his unlawful conduct.

**COUNT VI**
**Breach of Fiduciary Duty and Duty of Loyalty**
**(Against Defendant Brian Thure)**

170. TFF incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

171. As President of TFTN, pursuant to Tennessee common law, Defendant was a fiduciary of TFF and owed to TFF and TFTN certain special duties of good faith, fair dealing, loyalty, and candor.

172. These duties required Mr. Thure to act solely in the best interests of TFF and TFTN, to avoid self-dealing, to safeguard TFF and TFTN assets, and to disclose material conflicts and misconduct.

173. As described herein, on numerous occasions, Mr. Thure breached his common law fiduciary duties to TFF and TFTN.

174. Mr. Thure breached those duties by converting TFF and TFTN assets for personal use, placing family members and personal-service providers on TFTN's payroll, directing vendors to perform work at personal properties at TFTN's expense, causing unauthorized donations and

reimbursements, falsifying expense reimbursement forms submitted to TFF, and using corporate credit cards and vehicles for personal benefit,

175. Due to Mr. Thure's active concealment of these breaches, TFF was unable to identify these breaches until recently.

176. Mr. Thure acted maliciously, intentionally, fraudulently, and/or recklessly, and TFF is entitled to punitive damages.

177. As a direct and proximate result of Mr. Thure's breaches of his fiduciary duty and duty of loyalty, TFF has suffered damages in an amount to be proven at trial, but in excess of $32,000,000, and Mr. Thure should be required to disgorge all benefits obtained through his unlawful conduct.

**COUNT VII**
**Conversion**
**(Against All Defendants)**

178. TFF incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

179. TFF and TFTN had ownership and possessory rights in the money, property, computer systems, vendor relationships, payroll funds, and other company assets that Mr. Thure controlled as President of TFTN.

180. Mr. Thure converted TFF's funds for his own use and benefit when he falsified expense reimbursements submitted to TFF and took unauthorized payments from TFF and TFTN.

181. Mr. Thure and Mrs. Thure converted TFF's funds for their own use and benefit when they charged personal, non-work-related expenses to the company's credit card.

182. Mr. Thure converted TFF's funds for his own use and personal benefit when he directed and authorized unauthorized bonuses and payments from TFF and TFTN for his family members and personal service-providers.

183. Mrs. Thure converted TFF's funds for her own use and benefit when she directed Mr. Thure to put her friend, who worked for her business Bear Clover Consulting, on the TFTN payroll in order to convert proceeds of TFTN for work performed by her friend for Mrs. Thure's personal business.

184. Mr. Thure's control over those funds and property was unauthorized and inconsistent with TFF and TFTN's right to use its assets solely for legitimate business purposes.

185. Mr. Thure intentionally exercised dominion and control over TFF and TFTN assets inconsistent with TFF's and TFTN's rights by causing them to be transferred, spent, or used for his own personal benefit and the benefit of his wife, and their family and co-conspirators.

186. Mr. Thure's conversion included, without limitation, causing payments to the MTS entity, funding family members and personal-service providers through TFTN payroll, diverting vendor labor and materials to personal properties, taking reimbursements for personal expenses, and using company credit cards, vehicles, and entertainment ticket assets for non-business purposes.

187. Mrs. Thure's conversion included, without limitation, funding her business and personal-service providers through TFTN payroll, using company credit cards for non-business purposes, and diverting TFTN funds for unauthorized donations.

188. Mr. McPherson's conversion included, without limitation, using TFTN funds reimbursed to his personal bank account connected to MTS to pay for Mr. Thure's personal family

34

projects, pay himself a stipend totaling hundreds of thousands of dollars, paying his child's tuition bill among other things.

189. Mr. McPherson knew or should have known that the funds flowing through his personal bank account were not legitimate compensation and were, in fact, proceeds of fraud against TFTN.

190. Defendants' actions were an intentional exercise of dominion over the funds and in defiance of TFF's rights.

191. By fraudulently claiming that non-company payments, expenses, and invoices were incurred while engaged in legitimate company business, and intentionally concealing the true nature of those payments, expenses, and invoices, Defendants caused TFF to make payments and reimbursements that Defendants were not authorized to receive, thereby converting TFF funds that rightfully belong to TFF.

192. Mr. Thure, Mrs. Thure, and Mr. McPherson have sought payment and/or reimbursement for non-company expenses and invoices for their own use and personal benefit.

193. As a result of Defendants' active concealment of their conduct, TFF only recently was able to discover it.

194. Defendants acted maliciously, intentionally, fraudulently, and/or recklessly, and TFF is entitled to punitive damages.

195. As a direct and proximate result of Defendants' conversion, TFF has suffered damages in an amount to be proven at trial, but in excess of $32,000,000, and Defendants should be required to disgorge all benefits obtained through their unlawful conduct.

35

## COUNT VIII
### Unjust Enrichment
### (Against All Defendants)

196. TFF incorporates by reference all preceding paragraphs of this Complaint as though fully set forth herein.

197. TFF conferred substantial benefits on Mr. Thure and Mrs. Thure by paying or reimbursing expenses that funded, among other things, the Thure's family payroll costs, personal employees, personal construction and remodeling work, personal credit card charges, vehicles, ticket purchases, charitable donations made for personal purposes, real estate and investment-related expenditures, and payments to MTS that were routed through Mr. McPherson's personal bank account at Wilson Bank and Trust and Pinnacle Financial Partners.

198. TFF also conferred substantial benefits on Mr. McPherson and MTS by paying over $12 million to MTS. Mr. McPherson personally benefited from these funds by, among other things, taking a regular stipend totaling hundreds of thousands of dollars and using the account proceeds to pay for his child's tuition.

199. Mr. McPherson and MTS knew of and appreciated those benefits because Mr. McPherson maintained the bank account through which the funds flowed, personally withdrew funds from the account for his and Mr. and Mrs. Thure's own use, and confirmed his knowledge of the fraudulent activity in communications with TFF representatives.

200. Mr. Thure and Mrs. Thure knew of and appreciated those benefits because Mr. Thure personally directed, approved, received, or controlled the payments and because he later provided financial information reflecting assets and obligations tied to the proceeds of his fraud, including the Hawaii property, the Humboldt County ranch, and the UC Berkeley football endowment.

36

201. Defendants fraudulently received in excess of $32,000,000 in TFF and TFTN funds for their personal expenses and illegitimate purposes under the guise of reimbursable operating expenses and legitimate vendor payments, thus depriving TFF and TFTN of those funds.

202. It would be inequitable and unjust for Defendants to retain any benefit obtained through the misconduct alleged herein.

203. TFF is therefore entitled to restitution, disgorgement, the imposition of a constructive trust or equitable lien, and any other equitable relief necessary to prevent Defendants from retaining the proceeds of their misconduct.

204. TFF respectfully requests restitution, a full accounting of all payments, reimbursements, and distributions illegitimately made to Defendants, and other equitable and compensatory relief the Court deems fair.

## **PRAYER FOR RELIEF**

WHEREFORE, TFF respectfully requests that the Court enter judgment in its favor and against Defendants, jointly and severally where applicable, and award all relief available at law and in equity, including the following:

a. An award of compensatory damages as permitted for each claim in an amount to be proven at trial, including but not limited to the amounts stolen, diverted, misappropriated, or wrongfully obtained through the schemes alleged above, which exceeds $32 million;

b. An award of consequential, incidental, and out-of-pocket damages, including investigation costs, forensic accounting costs, forensic information-technology costs, remediation costs, and other costs incurred to identify, investigate, contain, and remedy Defendants' misconduct;

37

c. Restitution, disgorgement, and forfeiture of all compensation, bonuses, benefits, reimbursements, proceeds, profits, property, and other things of value that Defendants obtained directly or indirectly through their wrongful conduct;

d. Imposition of a constructive trust, equitable lien, accounting, and/or other equitable tracing remedy over funds, accounts, real property, personal property, investments, securities, vehicles, equipment, and other assets acquired, improved, maintained, or funded with misappropriated funds;

e. Injunctive relief and other equitable relief, including without limitation, temporary, preliminary, and permanent injunctive relief, where permitted, prohibiting Defendants and those acting in concert with them from transferring, dissipating, concealing, encumbering, destroying, or otherwise disposing of assets, records, electronically stored information, devices, accounts, or other evidence relating to the misconduct alleged in this Complaint;

f. An order requiring Defendants to return and preserve all TFF and TFTN property, records, data, credentials, devices, communications, documents, files, and electronically stored information in their possession, custody, or control, and to provide a complete accounting of any such materials that have been transferred, deleted, altered, or withheld;

g. All damages and equitable relief available under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, and the Tennessee Personal and Commercial Computer Act, Tenn. Code Ann. § 39-14-604(a), including relief for losses caused by Defendant's unauthorized and/or improper access to and use of protected computers, systems, data, and networks;

h. Treble damages, statutory, and/or punitive damages in an amount sufficient to punish Defendants and deter similar misconduct, based on Defendants' intentional, fraudulent, malicious, and willful conduct;

38

i.      Prejudgment and post-judgment interest at the maximum rate permitted by law;

j.      Costs, expenses, and attorneys' fees to the extent permitted by statute, rule, contract, equity, or other applicable law; and

k.      Such other and further relief to which it may otherwise be entitled as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

TFF, by counsel, requests a trial by jury on all issues deemed so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

DATED: June 5, 2026          Respectfully submitted,

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
Truist Plaza
401 Commerce Street
Suite 1200
Nashville, TN 37219
Telephone:  615-254-1900
Facsimile:  615-254-1908


By:  */s/  Darius Walker, Jr.*
      Darius Walker, Jr. TN #35408
      Erin A. Shackelford, TN #37488

      *Attorneys For Plaintiff Taylor Fresh Foods, Inc.*