**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| TAYLOR FRESH FOODS, INC., a Delaware corporation, | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) ) Case No. 3:26-cv-00772 |
| BRIAN THURE, an individual; JULIE THURE, an individual; MTS BUILDING AND ELECTRICAL; and JAMES MCPHERSON, an individual, | ) ) ) ) ) ) |
| Defendants. | ) ) ) |

**MEMORANDUM IN SUPPORT OF DEFENDANTS BRIAN AND JULIE THURE'S MOTION TO STAY CIVIL PROCEEDINGS PENDING RESOLUTION OF FEDERAL CRIMINAL INVESTIGATION**

Defendants Brian Thure and Julie Thure (the "Thures") respectfully move this Court, pursuant to its inherent authority to control its docket, to immediately stay these civil proceedings pending the resolution of the parallel federal criminal investigation arising from the same conduct alleged in the Complaint. In support, the Thures state as follows:

**INTRODUCTION**

Before Taylor Fresh Foods, Inc. ("TFF") filed the Complaint, its own lawyers had already pointed the Department of Justice at the Thures. The same law firm that signed this civil Complaint—Ogletree, Deakins, Nash, Smoak & Stewart, P.C.— supplied the Thures' undersigned counsel with the direct contact information for an

IRS Criminal Investigation Special Agent and a United States Postal Inspector, and a federal grand-jury-stage investigation supervised by the United States Attorney's Office for the Middle District of Tennessee has been underway ever since. TFF set the criminal machinery in motion and now asks this Court to let it run a civil action on a parallel track over the identical alleged $32 million in conduct. Worse still, TFF has now made its intentions explicit: when the Thures sought a brief extension as a courtesy after being served, TFF refused and announced it will seek expedited discovery—including immediate depositions of both Thures—to race out ahead of the very criminal investigation it started.

That is precisely the situation in which a stay protects the defendant, the Court, and the public alike. This civil case and the criminal investigation are not merely related—they are the *same case* wearing different clothes. They concern the same individuals, the same documents, the same witnesses, the same transactions, the same alleged intent, and the same alleged loss amount. Forcing the Thures to litigate the civil action now would compel them to choose between defending themselves and preserving their Fifth Amendment privilege at the very moment a federal grand jury investigation looms, and their counsel actively works on defending them in the course of that federal criminal investigation. The Court's docket, meanwhile, gains nothing from parallel litigation that the criminal resolution will likely streamline or moot—especially because any potential criminal restitution or forfeiture order would return the disputed funds to TFF, the same recovery TFF seeks here.

2

The Thures do not ask for a blanket stay. They request a stay of ninety (90) days, with a status report due to the Court at the end of that period. A short, supervised stay is the modest and sensible course.

## SUMMARY OF ARGUMENT

Each of the six factors the Sixth Circuit weighs supports a stay, and the controlling consideration—the balance of hardships—favors the Thures decisively.

The overlap between this civil case and the criminal investigation is complete. They concern the same alleged loss of $32 million, the same invoices and payroll and bank records, the same TFF employees, the same recorded phone calls, and the same question of fraudulent intent. That overlap—the most important factor—eliminates any doubt that civil discovery would tread on criminal ground.

The fact that no indictment has been handed down yet doesn't change things. The investigation is not speculative. It is staffed by IRS Criminal Investigation and the Postal Inspection Service and supervised by the Deputy Criminal Chief for White Collar Crime in this District. The Sixth Circuit and the courts of this District grant pre-indictment stays on exactly such a showing of an active, documented, parallel investigation.

The remaining factors line up the same way. TFF suffers no prejudice from a short, supervised stay—and has already made clear that it aims to recover assets through criminal restitution and forfeiture. The Thures, by contrast, face the loss of their Fifth Amendment privilege and the burden of simultaneous federal civil litigation over identical alleged conduct. The Court's interest in economy favors

letting the criminal matter narrow, if not fully resolve, the issues. And the public interest favors protecting the integrity of the criminal process against an end-run through civil discovery—particularly where TFF's own counsel referred the matter to the government before filing suit. The Thures respectfully request only a brief ninety (90) day stay, at the end of which the parties will provide the Court with a status report regarding whether a continuation of the stay is appropriate.

## BACKGROUND

**I.    TFF's counsel referred the Thures to the United States Attorney's Office, and an active federal investigation has been underway for months.**

The criminal investigation in this matter did not arise by happenstance. It traces directly to TFF and its counsel. A full month before TFF filed this civil Complaint—Jane Norberg of Ogletree, Deakins, Nash, Smoak & Stewart, P.C., TFF's counsel, provided the names and direct contact information for two federal criminal investigators: Special Agent Andrew Locke of IRS Criminal Investigation and Inspector Chris Morris of the United States Postal Inspection Service. Ogletree Deakins is the same firm that, one month later, signed and filed the Complaint here. (*See* Dkt. 1 at 39 (signature block).)

The Thures' counsel acted on that referral. The next day, May 6, 2026, counsel emailed Special Agent Locke and Inspector Morris, explaining that the firm represents Brian Thure and that it had been "provided your names by Jane Norberg, counsel for Mr. Thure's former employer, Taylor Farms." (Ex. A at 5.) Within hours, Special Agent Locke responded that "Inspector Morris, myself, and the case AUSA are available for a call," confirming not only an active investigation but the

involvement of an Assistant United States Attorney already assigned to the matter. (*Id.*). Undersigned had a call with the AUSA later that same day, and later confirmed, on May 19, that both sides were still meeting on June 8.

The investigation is being run out of the United States Attorney's Office for the Middle District of Tennessee. Over the following weeks, the Thures' counsel coordinated directly with Chris Suedekum, the Deputy Criminal Chief for White Collar Crime in that office, to schedule an in-person meeting regarding "the state of the investigation and potential resolutions." (*Id.* at 4.) The parties scheduled that meeting for June 8, 2026. (*Id.* at 2.) During the June 8, 2026 meeting, the government confirmed that Mr. Thure is a "target" of the criminal investigation, and Mrs. Thure is a "subject." (Ex. A at 1.)

## II. TFF's civil Complaint targets the identical conduct under federal criminal scrutiny.

TFF filed this action on June 5, 2026. The Complaint alleges that Brian Thure, the former President of Taylor Farms Tennessee, Inc. ("TFTN"), and Julie Thure orchestrated a multi-year scheme to divert more than $32 million from the company through fabricated vendor invoices, unauthorized payroll, falsified expense reimbursements, diverted construction work, corporate credit-card misuse, and the routing of funds through a purported sham entity. (*See* Dkt. 1 at ¶¶ 3–4, 31, 122.) It pleads claims for violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030; violation of the Tennessee Personal and Commercial Computer Act, Tenn. Code Ann. § 39-14-602; fraud; fraudulent concealment; breach of fiduciary duty; conversion; civil conspiracy; and unjust enrichment. (*Id.* ¶¶ 123–204.)

The Complaint is, on its face, a criminal-style fraud narrative. It repeatedly points to "admissions," recorded telephone calls with TFF representatives, an alleged confessional voicemail to TFF's CEO, and purportedly incriminating text messages. (*Id.* ¶ 32.) It alleges "knowing, intentional, and willful" misconduct, (*id.* ¶ 111), structured to "avoid detection," (*id.* ¶¶ 17, 43, 55) and devotes entire sections to "Defendants' Intent to Defraud" and "Concealment of the Fraud." (*Id.* at 21–24.) The overlap between this civil action and the criminal investigation is not partial. It is total.

## LEGAL STANDARD

A federal district court possesses the inherent authority to manage its docket, including the discretion to stay proceedings before it. *Landis v. N. Am. Co.,* 299 U.S. 248, 254–55 (1936). A court's "power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes in its docket with economy of time and effort for itself, for counsel and for litigants, and the entry of such an order ordinarily rests with the sound discretion of the District Court." *FTC v. E.M.A Nationwide, Inc.,* 767 F.3d 611, 626–27 (6th Cir. 2014) (quotation omitted). The Sixth Circuit recognizes that a stay of civil proceedings pending the resolution of a parallel criminal matter is an available, if "extraordinary," remedy. *Id.* at 627. The party seeking the stay bears the burden of showing "there is pressing need for delay, and that neither the other party nor the public will suffer harm from entry of the order." *Id.* at 627–628.

Courts in this Circuit and District weigh six factors: (1) the extent to which the issues in the criminal matter overlap with those in the civil case; (2) the status of the criminal matter, including whether an indictment has issued; (3) the plaintiff's interest in proceeding expeditiously, balanced against the prejudice of delay; (4) the private interests of and burden on the defendant; (5) the interests of the court; and (6) the public interest. *E.M.A. Nationwide,* 767 F.3d at 627; *FemHealth USA Inc. v. Williams,* 640 F. Supp. 3d 809, 812 (M.D. Tenn. 2022); *Doe v. Matthew 25, Inc.,* 322 F. Supp. 3d 843, 849 (M.D. Tenn. 2018).

These factors are grounded in the Fifth Amendment. A stay is warranted where the denial of relief "could impair a party's Fifth Amendment privilege against self-incrimination, extend criminal discovery beyond the limits" of Federal Rule of Criminal Procedure 16(b), "expose the defense's theory to the prosecution in advance of trial, or otherwise prejudice the criminal case." *Chao v. Fleming,* 498 F. Supp. 2d 1034, 1037 (W.D. Mich. 2007); *see Trs. of Plumbers & Pipefitters Nat'l Pension Fund v. Transworld Mech., Inc.,* 886 F. Supp. 1134, 1138 (S.D.N.Y. 1995).

## ARGUMENT

### I. The Balance of Hardships Decisively Favors a Stay.

The "most important factor is the balance of the hardships." *E.M.A. Nationwide,* 767 F.3d at 628. Here, the hardships are profoundly asymmetric.

Consider first what the Thures stand to lose. Without an immediate stay, they confront the precise dilemma the Constitution forbids forcing on a person facing criminal jeopardy: respond to the allegations in the civil case and arm the prosecution or stay silent and surrender the civil case to an adverse inference. *See In re*

7

*Morganroth v. Fitzsimmons*, 718 F.2d 161, 167 (6th Cir. 1983) ("A valid assertion of the [F]ifth [A]mendment privilege exists where a witness has reasonable cause to apprehend a real danger of incrimination.). Forcing the Thures to respond to the allegations in the complaint, respond to written discovery, and give deposition testimony in this civil case is not merely an inconvenience—it would erode their constitutional privilege, with no way to claw back a deposition transcript or an interrogatory answer once it exists. The harm compounds with every discovery request, because each one maps onto the same conduct the government is investigating. The Thures would be made to choose, repeatedly and under oath, between two ways of losing.

The prejudice runs deeper still, because the overlap here is not only factual but legal—and that distinction matters. The Complaint's Count One pleads a violation of 18 U.S.C. § 1030, the Computer Fraud and Abuse Act, a federal criminal statute that happens to carry a private right of action. *See* 18 U.S.C. § 1030(g). The elements TFF must prove in this civil action are the elements the government must prove to convict. That means the Thures cannot litigate the civil claim without litigating the criminal one. The problem arrives at the threshold. Any Rule 12 motion testing the § 1030 count would require the Thures to lay out, in a public filing and on the merits, exactly how they read the statute, which elements they contest, and why the alleged conduct might fall outside the statute's reach—whether the separate internet connection constituted access "without authorization" or "exceeding authorized access," whether TFF can establish the requisite "loss," and whether the alleged intent satisfies the

8

statute. Every one of those arguments is the Thures' defense to the active criminal investigation. To brief them now is to hand the United States Attorney's Office a complete preview of the defense's legal theory before an indictment is even returned—the precise harm the stay doctrine guards against. *See Chao*, 498 F. Supp. 2d at 1037 (a stay is warranted where civil proceedings would "expose the defense's theory to the prosecution in advance of trial"); *see also United States v. Kaufman*, No. CR 25-30025-MGM, 2025 WL 1994617, at *3 (D. Mass. July 17, 2025) (recognizing that, in general, "a criminal defendant has . . . a right to protect his trial strategy" and should not be required to "disclos[e] to the government of [his] theory of the case."). If this case is not stayed, the Thures would be forced to choose between mounting their best statutory defense in the civil case and preserving it for the criminal one. No protective order can repair that disclosure, because the legal arguments, once filed, are read by everyone, including the United States Attorney Office for the Middle District of Tennessee.

On the other hand, consider what TFF stands to lose. The answer is nothing it cannot recover. TFF seeks money. A stay does not extinguish that claim, shrink it, or release any defendant from it. It postpones it, briefly and under the Court's supervision, while the parallel criminal matter runs its course. The evidence is preserved because, as the Complaint makes clear, TFF has already gathered it. The Thures are not going anywhere. And the money TFF wants is the very money a criminal restitution or forfeiture order would return to it as the victim.

9

TFF is not being asked to forgo its remedy. It is being asked to wait a few months for a process it set in motion to conclude—a process that TFF no doubt is pushing to use to secure exactly the same thing it seeks here, just without doing any discovery. A delay that costs nothing and may yield everything is not a hardship. *See S.E.C. v. Healthsouth Corp.*, 261 F.Supp.2d 1298, 1327 (N.D.Ala.2003) (granting a pre-indictment stay where the indictment was "an eventuality" and "the harm to [defendant] from blindly pushing ahead with this matter [would] greatly outweigh the prejudice to the SEC from a stay of this civil proceeding").

TFF's own conduct when the Thures sought a routine extension confirms the point. When the Thures requested a short extension to respond to a Complaint spanning alleged conduct that reaches back nearly fourteen years, TFF refused—and announced instead that it would move for expedited discovery in advance of the Rule 26(f) conference, demanding that both Brian and Julie Thure sit for depositions on an accelerated schedule. The harm TFF's demand would inflict is the precise harm this motion seeks to prevent: depositions of two individuals—one a criminal target, the other a subject—on the very transactions the government is actively investigating, on a timeline TFF has engineered to outrun the criminal process it set in motion. TFF's push for expedited discovery is reason to grant an immediate stay.

The two sides of the scale could not be more different in kind. On one side sits the Thure's risk of irreparable constitutional injury. On the other sits a recoverable and temporary delay in a money damages case. This is not a close call dressed up as

one. The balance of hardships—the controlling factor—tilts decisively toward the Thures.

This is also not a case in which a defendant invokes a hypothetical investigation to stall a meritorious civil claim. It is a case in which the civil plaintiff lit the criminal fuse, the criminal investigation is documented and active, the conduct is identical, and the only thing missing is the indictment, which TFF presses for to this day. A short stay protects the Thures' constitutional rights, conserves this Court's resources, safeguards the integrity of the federal criminal process, and costs TFF nothing it cannot recover later. The factors do not merely permit a stay. They call for one.

## II. There Is No Daylight Between the Civil Case and the Criminal Investigation.

The overlap factor is often "considered the most important" of the six, because "if there is no overlap, then there would be no danger of self-incrimination and no need for a stay." *Chao,* 498 F. Supp. 2d at 1039. Accordingly, the "existence of a nexus between the parallel proceedings sufficient to show that such proceedings are related and involve substantially similar issues is the threshold factor for a stay." *Eastwood v. United States*, No. 2:06-CV-164, 2008 WL 5412857, at *2 (E.D. Tenn. Nov. 14, 2008). Put differently, a stay is most appropriate "where the civil and criminal actions involve the same subject matter," *Chao*, 498 F. Supp. 2d at 1039, and where "[a]ny indictment handed down as a result of the investigation will be based on the same factual circumstances that Plaintiff alleges in his complaint," *McGee v. Madison Cty.*, No. 1:14-cv-010609, 2015 WL 3648986, at *8 (W.D. Tenn. June 10, 2015).

Here, the civil Complaint and the criminal investigation arise from the same set of alleged facts. TFF contends that the Thures diverted more than $32 million from TFTN between roughly 2013 and 2026. The same vendor invoices, payroll records, expense reports, bank accounts, and credit-card statements that the Complaint catalogs as evidence of "fraud" are the documents a grand jury could subpoena (if TFF has not already provided them to the government). The same individuals the Complaint names as witnesses—TFTN's former Controller, its former IT Manager, accounting and maintenance personnel, and the Thures themselves— are the witnesses the government will examine. The same recorded calls, voicemail, and text messages the Complaint characterizes as "admissions," (Dkt. 1 ¶ 32), are the statements a prosecutor would build a charging document around. And the same mental state the Complaint must prove—knowing, intentional, fraudulent intent, (*id.* ¶¶ 111, 154–56)—is the scienter element of the federal offenses under investigation. In undersigned counsel's June 8, 2026 meeting with the government, the government confirmed that it had already received a copy of the Complaint (filed just the prior business day before the meeting) in this case and was criminally investigating its allegations in full.

Where the criminal and civil matters are "virtually identical" and "likely [to] involve many of the same issues, witnesses, and evidence," this factor favors a stay. *SEC v. Abdallah,* 313 F.R.D. 59, 64 (N.D. Ohio 2016). This is not the partial-overlap scenario in which courts treat the factor as neutral because the civil action sweeps in transactions absent from the criminal case. *Cf. SEC v. Bongiorno,* 594 F. Supp. 3d

938, 945 (N.D. Ohio 2022). The criminal investigation here was triggered by the very same conduct TFF now sues over; TFF's counsel made the referral on the strength of that identical conduct. This central and controlling factor decisively favors a stay. The fact that neither TFF nor the Thures knows the exact status of the criminal investigation does not change things. *See Sidari v. Orleans Cty.*, 180 F.R.D. 226, 229 (W.D.N.Y. 1997) (stay is appropriate even when "[t]he exact parameters of the criminal investigation are not known (except by those doing the investigation).").

Nothing about the legal labels on the Complaint changes that conclusion. TFF dresses its allegations in civil causes of action—Computer Fraud and Abuse Act, conversion, breach of fiduciary duty, unjust enrichment—but the conduct those theories rest on is the conduct that the Department of Justice is evaluating for criminal charges. The Complaint alleges the routing of funds through a "sham entity" and personal bank accounts, (Dkt. 1 at ¶¶ 3, 21, 50–53)*, transfers through "cryptocurrency exchanges" to "conceal and dissipate" proceeds, (*id.* ¶¶ 110(e), 119), and a $600,000 transfer made after discovery "to further conceal" the proceeds of the alleged fraud. (*Id.* ¶ 110(f).) These are not incidental civil details; they are the predicate acts of alleged federal crimes. That the same facts can be pleaded civilly and charged criminally is the entire reason the stay doctrine exists. *See SEC v. Dresser Indus., Inc.,* 628 F.2d 1368, 1374 (D.C. Cir. 1980) (en banc) (recognizing that civil and criminal laws "frequently overlap," creating parallel proceedings that can warrant stays).

## III. The Criminal Investigation Is Active, Documented, And Advancing Toward a Charging Decision.

The next factor examines the status of the criminal case. The fact that a grand jury has not yet returned an indictment does not change the analysis. In fact, that fact narrows the inquiry; it does not end it. There is no "hard-and-fast rule" concerning stays of cases pre-indictment versus post-indictment. *Patrick v. Apple*, No. 920CV0047LEKDJS, 2020 WL 4816015, at *4 (N.D.N.Y. Aug. 19, 2020); *see also In re 650 Fifth Ave.*, No. 08-CV-10934, 2011 WL 3586169, at *4 (S.D.N.Y. Aug. 12, 2011) (noting that "[t]here is no question that a court has discretion to stay a civil litigation even in favor of a pending investigation that has not ripened into an indictment[.]") Here, this factor weights in the Thures favor.

A stay can be appropriate even when there is no indictment filed. *See Chao,* 498 F. Supp. 2d at 1039 (a stay was appropriate even though there was no indictment, but it was "an eventuality"). Indeed, a stay can be appropriate when the government, as here, merely "represents that it intends to pursue criminal charges against [the civil plaintiff]." *Bongiorno*, 594 F. Supp. 3d at 944; *see also Chao*, 498 F. Supp. 2d at 1039–40 (granting a pre-indictment stay of a parallel civil case where the existence of a criminal investigation was confirmed "based upon statements by [the] AUSA" and an indictment "[was] not far off"). A pre-indictment stay may be warranted, for instance, when "there is an imminent likelihood that the defendant will be subject to a criminal proceeding, including a trial, in the very near future." *Maldanado v. City of New York*, No. 17-CV-6618 (AJN), 2018 WL 2561026, at *2 (S.D.N.Y. June 4, 2018).

The Sixth Circuit has never held that an indictment is a prerequisite. In fact, they have regularly made the opposite clear: a stay "should not be categorically denied" pre-indictment and may be granted "even [without] an indictment . . . if the government is conducting an active parallel criminal investigation." *Chao,* 498 F. Supp. 2d at 1038 (quoting *Walsh Sec., Inc. v. Cristo Prop. Mgmt., Ltd.,* 7 F. Supp. 2d 523, 527 (D.N.J. 1998)). Indeed, the foundational Sixth Circuit framework comes from a case in which the district court *granted* a stay with no indictment in hand. *See Id.* at 1041 (staying civil action for ninety days).

Courts have granted pre-indictment stays where the movant shows that the investigation is real and active rather than speculative. In *McGee v. Madison County,* the Western District of Tennessee stayed a civil action where the Department of Justice had opened an investigation in which the civil defendant was expected to be a primary suspect, even without a formal indictment. 2015 WL 3648986 (W.D. Tenn. June 10, 2015). Stay denials, by contrast, involve the opposite showing: in *Doe v. Matthew 25, Inc.,* the court declined a stay where the defendant could not produce evidence that "there truly [was] a criminal investigation being pursued against him," 322 F. Supp. 3d at 851, and in *Tri-Star Airlines, Inc. v. Willis Careen Corp.,* the court denied a stay where the civil defendant was not even under criminal investigation, 75 F. Supp. 2d 835 (W.D. Tenn. 1999). *See also Franz v. Oxford Cmty. Sch. Dist.*, No. 21-CV-12871, 2022 WL 883022, at *2 (E.D. Mich. Mar. 24, 2022) (denying stay where civil defendants did not claim to be subjects of any criminal investigation).

15

The Thures are nowhere near the speculative end of that spectrum. The record before the Court contains contemporaneous emails establishing that two federal agencies—IRS Criminal Investigation and the Postal Inspection Service—are actively investigating, that a case AUSA is assigned, and that the Deputy Criminal Chief for White Collar Crime in this District is personally coordinating meetings about "the state of the investigation and potential resolutions." (Ex. A at 4.) This is exactly the concrete evidence of an active, parallel criminal investigation that distinguishes a grantable pre-indictment motion from a denied one. The Thures are not asking the Court to take their fear of prosecution on faith. They are showing it in TFF's own counsel's emails. *See Franz*, 2022 WL 883022, at *2 (stay appropriate where there is evidence that "at least one party to the civil case will be a defendant in a criminal case, or at least subject to a criminal investigation").

The two rationales the Sixth Circuit gives for granting post-indictment stays more often both point toward granting this one. The first rationale is that the "likelihood that a defendant may make incriminating statements is greatest after an indictment has issued." *E.M.A. Nationwide,* 767 F.3d at 628. But that likelihood is already acute here. The Complaint alleges that the Thures have made recorded admissions, sent supposedly incriminating texts, and left a confessional voicemail. (Dkt. 1 at ¶ 32.) "Civil courts should avoid [churning] over the same evidentiary material that is at issue in a parallel criminal matter." *al-Baluchi v. Esper*, 392 F. Supp. 3d 46, 67 n.20 (D.D.C. 2019) (granting a stay). With the government already in possession of, or actively seeking, such statements, every additional sworn word the

Thures becomes a conduit for discovery in the criminal case. The second rationale is that the Speedy Trial Act gives a post-indictment stay a defined endpoint, limiting prejudice to the plaintiff. *See GM Glob. Tech. Operations, LLC v. Quality Collision Parts, Inc.*, No. 23-13026, 2026 WL 972934, at *6 (E.D. Mich. Apr. 10, 2026). The Thures address that concern directly by proposing an initial ninety-day pause, rather than a blanket stay. They ask the Court to achieve, through a limited stay, the very thing the Speedy Trial Act would achieve automatically.

There also is a striking feature of this case that fortifies the second factor. TFF did not stumble into a parallel investigation—it helped create one. Its counsel handed the Thures' lawyers the agents' names and numbers. (Ex. A.) Having pointed the government at the Thures, TFF cannot credibly tell this Court that the criminal investigation is too speculative to matter. Its own conduct refutes the argument before TFF can make it.

## IV. TFF Will Not Be Prejudiced by a Short Stay.

The third factor balances the plaintiff's interest in proceeding against the prejudice of delay. TFF will identify the familiar concerns—fading memories, dissipating assets, the desire for prompt relief. None withstands scrutiny here.

First, the requested stay is short and self-limiting. The Thures do not seek the open-ended halt that courts rightly disfavor. They propose a ninety (90) day stay, at the conclusion of which both parties will provide a status report. Courts in this Circuit routinely impose exactly such time-limited stays. *See Chao,* 498 F. Supp. 2d at 1041 (ninety days, with leave to seek extension); *Abdallah,* 313 F.R.D. at 65 (ninety days).

At the conclusion of the stay, the Court should review the matter to determine whether the stay should be lifted.

Second, any asserted urgency by TFF is undercut by the relief a criminal resolution will provide. For starters, in situations like this, any "prejudice to the plaintiffs in the civil case is reduced since the criminal case will likely be quickly resolved due to Speedy Trial Act consideration." *Bongiorno*, 594 F. Supp. 3d 943–44. Further, TFF's central objective in this action is the recovery of the allegedly misappropriated funds. Its Prayer for Relief seeks compensatory damages, restitution, disgorgement, and forfeiture. (Dkt. 1 at 37–38.) Any conceivable federal criminal resolution would deliver much of that recovery directly. Restitution under the Mandatory Victims Restitution Act, 18 U.S.C. § 3663A, and criminal forfeiture of fraud proceeds, 18 U.S.C. §§ 981–982, would route recovered funds to TFF as the alleged victim. TFF is not forgoing its remedy by waiting; it is positioning itself to obtain that remedy through a parallel process it set in motion. Far from being prejudiced by the stay, TFF stands to benefit from it. Whatever interests TFF might have, "those interests will be represented in the criminal case." *Chao*, 498 F. Supp. 2d at 1040. In no way will a brief stay "place this case in limbo for years." *Ohio Env't Council v. U.S. Dist. Ct., S. Dist. of Ohio, E. Div.*, 565 F.2d 393, 396 (6th Cir. 1977).

Third, there are no concerns about preservation of evidence. The Complaint itself alleges that TFF has already conducted an extensive internal investigation employing outside counsel and forensic accountants, has gathered "dozens of fraudulent invoices, falsified expense reports, and other documentary evidence," and

has obtained recorded statements and a personal balance sheet from the Thures. (Dkt. 1 at ¶¶ 30–33.) The evidence is in hand. And the federal agencies investigating this matter wield grand jury subpoena power that will preserve and develop the record during any stay. There is no risk that waiting will cause TFF's proof to evaporate.

TFF is poorly positioned to complain that the criminal track must briefly take precedence. Unlike the plaintiff in *Bongiorno,* who filed its civil action nearly two years before any criminal charges and then watched the "passage of time compromise []" its ability to pursue its claims, 594 F. Supp. 3d at 944, TFF set the criminal process in motion first and filed this suit only afterward. It *chose* to create the parallel track. Having done so, it is poorly positioned to complain that the criminal track must briefly take precedence. The asymmetry in this case is the opposite of the one that defeated a stay in *Bongiorno*. The criminal matter here came first, and the civil suit followed.

## V. The Thures' Fifth Amendment Interests and the Burden of Simultaneous Litigation Weigh Heavily in Favor of a Stay.

The fourth factor—the defendant's private interests and burdens—lies at the heart of this motion. "The simultaneous litigation of criminal charges and civil causes of action against the same person, for the same conduct," gives rise to Fifth Amendment concerns that can "warrant [] a stay of the civil proceedings." *Matthew 25, Inc.,* 322 F. Supp. 3d at 850. The danger is concrete and immediate here.

Without a stay, the Thures face an impossible choice that the stay doctrine exists to prevent. "[I]t should come as no surprise that defending multiple actions

simultaneously imposes substantial burdens on Defendants that might induce them to resolve one or both cases for reasons having little to do with the merits." *Bongiorno*, 594 F. Supp. 3d at 944. If the Thures answer the complaint and subsequent civil discovery candidly—sit for depositions about the alleged scheme, respond to interrogatories about the invoices and payroll, admit or deny requests for admission framed around the elements of fraud, authenticate documents—they hand the government a roadmap and a sworn transcript usable against them in the criminal matter. If, instead, they invoke the privilege, they expose themselves to the adverse inference permitted in civil litigation. *See Baxter v. Palmigiano,* 425 U.S. 308, 318 (1976). In either path, the "assertion of his Fifth Amendment right [will] create complications and difficulties for all parties, including Plaintiff, during the discovery process" and both TFF and the Thures "would be forced to litigate the action in piecemeal fashion, leading to the burden of duplicative discovery, depositions, and wasted time and resources once [the Thures] can participate fully in discovery." *Self v. Simmons*, No. 1:24-CV-267, 2025 WL 887814, at *3 (E.D. Tenn. Mar. 21, 2025) (granting a stay). And even if it is "not unconstitutionally coercive," the very fact that the Thures would be forced to pick between their Fifth Amendment rights and defending this civil case pushes this factor heavily in favor of a stay. *Bongiorno*, 594 F. Supp. 3d at 945.

The risks are not hypothetical; they are specific to the discovery TFF will pursue. TFF has already announced that it intends to depose both Brian and Julie Thure on an expedited basis, before even the Rule 26(f) conference. (Ex. C.) But the

20

risks also are not limited to the Thures. Proceeding with the civil case while the parallel criminal investigation continues will inevitably "create complications and difficulties for [TFF] and the court as well during the discovery process." *Matthew 25, Inc.*, 322 F. Supp. 3d at 850. For example, TFF "could use civil discovery to obtain evidence and information" that it will invariably give the government "for use in the criminal prosecution, circumventing the protections of the Fifth Amendment." *Bongiorno*, 594 F. Supp. 3d at 944. Depositions of Brian and Julie Thure would necessarily probe the very transactions under criminal investigation, creating sworn testimony available to prosecutors. Interrogatories would require the Thures to identify participants, explain communications, and articulate intent—core criminal subjects. Requests for admission would force them to concede or contest the elements of the alleged fraud. Document requests would compel productions with testimonial implications. Each category of discovery TFF would become a stalking horse for the criminal investigation. And the Court would be forced to rule on every constitutional issue as it arises.

The available alternatives cannot protect the Thures here. Because the overlap between the civil and criminal matters is complete, a topic-by-topic partial stay would be unworkable—nearly every deposition question, interrogatory, and document request would implicate the same conduct, generating repeated privilege disputes that would consume the parties' and the Court's resources without protecting anyone. *Cf. Superior Home Mortg., LLC v. Marbury,* No. 119CV01056STAJAY, 2020 WL 1878861, at *2 (W.D. Tenn. Apr. 15, 2020) ("The Court agrees with Defendant that it

would be a burden on him to sit for a deposition in this case, during which he would assert his Fifth Amendment rights, and then have to reconvene the deposition after the criminal matter is resolved."). A protective order limiting downstream use is likewise inadequate, because it cannot un-ring the bell of testimony already given or strategy already revealed. *Id.* at n.5 (declining to enter a partial stay "limited to issues protected by the Fifth Amendment"). Only a complete stay addresses the problem at its source.

Both Thures hold the privilege, and both face the dilemma. The Complaint names Julie Thure as an active participant—alleging that she submitted millions in fraudulent reimbursements, directed unauthorized donations, and operated personal businesses subsidized by company resources. (Dkt. 1 at ¶¶ 18, 63–67, 92–95.) She is, according to the AUSA, a subject of the same investigation, and her testimony would carry the same incriminating risk as her husband's. The fourth factor weighs heavily in favor of a stay for both of them.

## VI.     A Stay Serves the Court's Interest in Judicial Economy.

The fifth factor asks whether a stay "will further the interest in economical use of judicial time and resources." *E.M.A. Nationwide,* 767 F.3d at 628. It will. Resolution of the criminal investigation is likely to "expedite the civil proceedings, avoiding the needless expense of judicial time and resources," because "[t]he conviction of a civil defendant as a result of a plea or following a trial can contribute significantly to the narrowing of issues in dispute in the overlapping civil case [] and promote settlement of civil litigation not only by that defendant but also by co-

defendants who do not face criminal charges." *Abdallah,* 313 F.R.D. at 65 (quotation omitted).

That logic applies with full force here. Should the criminal investigation resolve by plea or verdict, the factual findings, admissions, and adjudications would streamline or eliminate much of what this Court would otherwise have to try—the existence of an alleged scheme, the amounts involved, the participants, and intent. Proceeding now invites duplicative discovery, parallel motion practice, and the real prospect of inconsistent factual records across two federal proceedings addressing identical conduct. A brief stay avoids that waste. And because the proposed stay is time-limited and subject to status reports, it will not produce the docket stagnation that counsels against disfavored blanket stays.

## VII. The Public Interest Favors Protecting the Integrity of the Criminal Investigation.

The sixth factor—the public interest—favors a stay. As a "general matter the public's interest in the integrity of the criminal case is entitled to precedence over the civil litigant." *Eddington v. Jackson*, No. 121CV01165HBKPC, 2024 WL 982560, at *1 (E.D. Cal. Feb. 20, 2024) (citation omitted); *see Abdallah,* 313 F.R.D. at 64 ("[T]he public interest in effective criminal prosecution generally outweighs any existing civil interests."). The public has a powerful interest in ensuring that civil discovery is not used—whether by the civil plaintiff or, indirectly, by the government—to circumvent the limits of criminal discovery under Fed. R. Crim. P. 16(b) and to erode the constitutional protections of a federal criminal target. *Mann v. Garcia*, No. 121CV00764AWIEPGPC, 2022 WL 412013, at *6 (E.D. Cal. Feb. 10, 2022) (public

interest favors a stay when allowing "the civil matter to proceed using the Federal Rules of Civil Procedure would likely interfere with the potential criminal case").

That concern is heightened by the relationship between TFF and the investigation. TFF referred the matter to federal investigators and then filed a civil action over the identical conduct, with the same firm appearing on both sides of the coin. (Ex. A; Dkt. 1 at 39.) Allowing broad civil discovery to proceed in those circumstances would risk turning this civil case into a discovery annex for the criminal investigation—precisely the abuse the stay doctrine guards against. The public's interest in a fair criminal process, untainted by an end-run around Rule 16, supports a stay. TFF demanding accelerated, pre-Rule 26(f) conference depositions of a criminal target is the Rule 16 end-run made concrete.

The countervailing public interest in prompt civil enforcement is diminished here, where the plaintiff is a private corporation seeking money—money that a criminal restitution or forfeiture order can return—rather than a regulator vindicating a statutory public mandate. *See SEC v. Nicholas*, 569 F. Supp. 2d 1065, 1073 (C.D. Cal. 2008) ("Staying the civil case, which carries only civil sanctions and monetary penalties, is not of an equally pressing nature" as a criminal case that could result in imprisonment of the criminal defendants).

For these reasons, a stay is in the public interest. This factor, too, favors the Thures.

**CONCLUSION**

For the foregoing reasons, the Thures respectfully request that the Court stay these civil proceedings for ninety (90) days and grant such other and further relief as the Court deems just and proper.

Date: June 19, 2026

Respectfully submitted,

LITSON PLLC

*/s/ John R. Glover*
Brent A. Hannafan (BPR # 25209)
John R. Glover (BPR # 037772)
54 Music Square East, Suite 300
Nashville, Tennessee 37203
Telephone: (615) 985-8187
brent@litson.co
jr@litson.co

*Counsel for Defendants Brian Thure and Julie Thure*

25

# CERTIFICATE OF SERVICE

I hereby certify that on June 19, 2026, a true and correct copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system, which will send notice of electronic filing to all counsel of record.

*/s/ John R. Glover*
John R. Glover
